**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DWIGHT SPENGLER, as Personal
Representative of the ESTATE OF VERONICA
J. BARKER,

        Plaintiff,                               Case No. 06-CV-10036-DT

v.

ADT SECURITY SERVICES, INC.,

        Defendant.
                                            /

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S "MOTION TO FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S "MOTION *IN LIMINE*," AND GRANTING SUMMARY JUDGMENT IN PART TO PLAINTIFF**

        This is a wrongful death case, in which the Defendant alarm company made a tragic mistake – dispatching emergency medical services to the wrong address after the decedent, an elderly, disabled woman near death, had activated her alarm for assistance. Plaintiff casts blame on Defendant's mistaken dispatch, and the attendant delay, for the death. Defendant questions, among other things, causation, suggesting that the evidence cannot demonstrate that the decedent would have survived even if speedier medical care had arrived. But, more fundamentally, a question looms about the tort relief Plaintiff seeks in this contract-based case.

        Pending before the court is Defendant ADT Security Services, Inc.'s "Motion for Summary Judgment" and its "Motion in Limine," which were both filed on August 15, 2006.  Each matter has been fully briefed and the court conducted a hearing on October 18, 2006.  For the reasons stated below, the court will grant Defendant summary

judgment in part, i.e., as to tort relief, deny the motion *in limine* as moot, and grant summary judgment to Plaintiff in part, i.e., insofar as the complaint states a claim for breach of contract.

## I.  FACTUAL BACKGROUND[1]

On May 10, 2004, Plaintiff Dwight Spengler signed a residential services contract with Defendant to install and monitor a security alarm at the home of Veronica Barker, his mother.  (Residential Services Contract ("Contract"), Def.'s Ex. B.)  Barker lived in a condominium on 34910 Chickadee Ridge in Richmond, Michigan.  (*Id.*)  The agreement included a portable alarm remote that Barker could activate when in distress.  (Contract at 1.)  Due to cancer of the larynx and previous medical treatment of that condition, she could not speak.  (Pl.'s Dep. at 11-13, Def.'s Ex. A.)[2]  Defendant therefore had instructions to call Plaintiff in the event of an alarm from Barker.  (Contract at 2.)

Defendant received an alarm from Barker on October 26, 2005.  (Event History Report, Def.'s Ex. C.)  Due to an error in the address that Defendant gave to dispatchers in response to the alarm, emergency medical services were delayed in their arrival at Barker's residence by, according to Plaintiff's timeline, about sixteen minutes.  (Pl.'s Resp ¶ 2.)  Plaintiff alleges that, were it not for the delay attributable to Defendant, Barker would not have died of heart failure.  (*Id.*)  Plaintiff filed suit in state court on

---

[1] Because the court concludes, for the reasons given below, that Defendant should prevail on narrow contractual grounds, a detailed exposition of the facts is not necessary.

[2] Barker did have surgeries meant to restore her ability to speak with the aid of a prosthetic device, but Plaintiff avers that at times she was unable to speak with the prosthetic, which "was not necessarily 100 percent."  (Pl.'s Dep. at 13, Def.'s Ex. A.)

December 6, 2005, alleging one count of negligence, which Defendant removed to this court pursuant to 28 U.S.C. § 1446 on January 4, 2006.  (Notice of Removal at 1.)

On August 15, 2006, Defendant filed the instant motion for summary judgment and a motion *in limine*.  Defendant challenges (1) the admissibility of the allegedly speculative and unreliable testimony of Plaintiff's medical expert,  (Mem. in Support of Def.'s Mot. *In Limine* at 1-2), (2) Defendant's theory of causation, (Mem. in Support of Def.'s Mot. for Summary Judgment at 22-27) ("Def.'s Br."), and (3) Defendant's ability to recover damages beyond $500 under the liability limiting provisions of the contract (*id.*, at 3, 29-33).

Because the court is satisfied, for the reasons stated below, that Defendant's third argument is dispositive, the court will, in the interests of clarity and judicial economy, not address the first two issues.

### III.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'") (citation omitted). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts, and draw all reasonable inferences from the admissible evidence presented, in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) ("[W]e must determine not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.") (quotation omitted). The court does not weigh the evidence to determine the truth of the matter, but must decide if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## IV.  DISCUSSION

### A.  Plaintiff's Claims Sound in Contract, Not Tort

The relationship between the parties was contractual.  The gravamen of Plaintiff's complaint is that Defendant failed to perform under the contract.  A tort arising out of a contractual relationship must rely on a duty independent of the contract.  *See e.g. Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997); *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956).  In *Rinaldo's*, the plaintiff sued the defendant in tort, alleging that by negligent tortious conduct the defendant harmed the plaintiff by negligently installing and maintaining telephone service to the plaintiff's business and by misdirecting calls intended for the plaintiff.  559 N.W.2d at 655.  The Michigan Supreme Court rejected the plaintiff's position that a court of general jurisdiction should hear his claims and instead decided that the Michigan Public Service Commission had jurisdiction as a regulatory body.  *Id.* at 656.  The court predicated its decision on the finding that the plaintiff only alleged breaches of contractual duties, none of which arose from independent legal obligations that would support an action in tort for a court of general jurisdiction to decide.  *Id.*

Similarly, in *Hart* the plaintiff sued the defendant in tort for neglect and for refusing to perform under an oral agreement to care for the plaintiff's orchard.  79 N.W.2d at 896.  The court decided that the plaintiff asserted an action in contract, not tort, and it rested its decision on the distinction between misfeasance and nonfeasance.  *Id.* at 896-898.  According to the court:

> [Before the court] is simply the violation of a promise to perform the
> agreement.  The only duty, other than that voluntarily assumed in the

> contract to which the defendant was subject, was his duty to perform his promise in a careful and skillful manner without risk of harm to others, the violation of which is not alleged. What we are left with is defendant's failure to complete his contracted-for performance. This is not a duty imposed by the law upon all, the violation of which gives rise to a tort action, but a duty arising out of the intentions of the parties themselves and owed only to those specific individuals to whom the promise runs. A tort action will not lie.

*Id.* at 898-899. Furthermore, the Sixth Circuit, while applying Michigan law, held that a tort action must predicate upon active negligence or misfeasance because no tort action may rest upon nonfeasance in the performance of a contract. *Int'l Harvesters Credit Corp. v. Wilkie*, 695 F.2d 231, 234 (6th Cir. 1982).

This case, at bottom, rests upon the failure of Defendant to meet Plaintiff's contractual expectations. According to the handwritten instructions on the parties' agreement:

> Veronica Barker is resident cannot talk [sic]. If panic is hit dispatch EMS/fire w/o prior contact to home. Contact Mr. Spengler imm. upon dispatch.

Contract, Def.'s Ex. B at 2. Plaintiff's claim would not exist absent his contractual relationship with Defendant as set out in the above language. The court is aware of no common law or other authority outside the four corners of the parties' agreement that required Defendant to be certain that the address in its database matched the origin of Barker's medical alert. *See Allendale v. Mutual Ins. Co. v. Triple-S Technologies, Inc.*, 851 F.Supp. 277 (W.D. Mich. 1993) (holding that third-party plaintiff could not bring negligence action for disconnection of security and fire alarm system). The court in *Allendale* held that "the contract between the parties was the source of any duty [the defendant] had to monitor or operate the alarm system which it may have breached."

6

*Id.* at 281. In this case, the contract was the sole source of Defendant's duty to give dispatchers the correct address for responding to a medical alarm from Barker.

Nor is the court persuaded that active negligence or misfeasance created the peril that Barker faced. Classic examples include a surgeon failing to clean instruments, an engineer leaving steam running, a builder leaving a ditch open in a public way, and an operator failing to sound a whistle at a crossing. *Hart*, 79 N.W.2d at 898. In each of these cases, "[m]achinery has been set in motion" and lives are put at risk independent of the breach of a promise. *Id.* These cases do not fairly describe Defendant's failure to send emergency medical services to the correct address. In this case, the peril that Barker faced was an acute medical event that Defendant did not create. By contract, Defendant was supposed to respond to her medical alarm, alert dispatchers, and inform them of her address. Defendant's failure to relay the correct address gives rise to a breach of contract action, not an independent tort claim. Although the grave consequences of the above classic examples sadly may match the outcome in this case, Defendant, unlike in the examples, did not create a general peril outside of a failure to perform under the contract.

Because Plaintiff has not pleaded an action in tort, the court need not reach the parties' arguments concerning causation. In addition, Defendant's motion *in limine*, which challenged the causation conclusions of Plaintiff's medical expert, will be denied as moot. Although Plaintiff's single count of negligence did not plead a separate contract action, the court will, pursuant to the analysis above, consider the substance of Plaintiff's complaint and not elevate as determinative the form in which it was presented.

Therefore, the court will view Plaintiff's cause of action as an action alleging a breach of contract.

### B.  Defendant Breached the Contract

Defendant confirmed at oral argument that it does not dispute initially giving the wrong address to emergency medical services and that it therefore does not dispute failing to perform under the contract.  The specific handwritten instructions on the contract required Defendant to, in the event of a medical alarm, "dispatch EMS/fire w/o prior contact to home."  Contract, Def.'s Ex. B at 2.  The "home" is clearly identified on the contract and there is no disputing the fact that Defendant initially gave dispatchers an incorrect address.  (Def.'s Mot. at ¶¶ 11-12.)  The court now turns to what damages, if any, are appropriate under the contract.

### B.  The Liability Limiting Provisions of the Contract Apply to This Case

Defendant contends that, under the terms of the parties' agreement, Plaintiff can only recover $500 for his contract claim.  Plaintiff contends that, because the contract was presented to him in a deceptive and fraudulent manner, the court should not apply the contractual language that limits Defendant's liability for failing to perform under the contract.  (Pl.'s Br. at 18-21.)  He contends that Defendant purposefully concealed from him these material provisions by printing them "on the back of the sub-copies of the agreement that [Plaintiff] signed."  (*Id.* at 19.)  Plaintiff in his brief argued that at oral argument the court would have to examine an original of the contract form and the paper it was printed upon in order to "fully appreciate the subtle design," Pl. Resp., p. 10,  and to comprehend the nature of the alleged deceptiveness. Defendant, upon the

court's request, submitted blank copies of the form contract.[3]  Having inspected the contract form, the court rejects Plaintiff's characterization of it as designed to mislead.

The contract consists of eight pages bound at the top.  The cover page is entitled "Residential Services Contract" and lists a table of contents for "attached important terms and conditions."  Among the list of twenty-eight are the following:

> 5. We Are Not an Insurer
> 6. No Liability; Limited Liability
> 7. Exclusive Damages Remedy
> 8. Hold Harmless

The following seven pages are the contract itself, with blank fields to be filled with various information, and some pages with text stating the terms and conditions.  Red text in the lower right corner of each of these pages indicates who retains the page upon signing of the contract, which are, in order of their appearance: administration, central storage, local office, customer (two pages), local office, and central storage.

---

[3] At oral argument, Plaintiff's counsel suggested that the blank form examined by the court was newer, and that it differed in a few respects from the actual form contract that Plaintiff signed. Those differences are apparent in comparing the blank's format to the photocopy of the Customer Copy of the original Spengler contract.  (Def.'s Mot. Ex. B).  The differences include the following: (1) the identical notice provision language appeared, in a marginally smaller font, in a location about 1/4 inch above the signature line, instead of directly above it, (2) the possible absence of a "cover page" on which a table of contents of the Terms and Conditions is printed, and (3) that the contract might not have required a second original signature by Plaintiff on a subsequent page. Defendant confirmed at the hearing that blank copies of the formerly used form contract were no longer available. The court is not persuaded that any of the differences are material, even viewing the facts in the light most favorable to Plaintiff. The court is not required to imagine how portions of the original contract, if any, that are not in the record, might have appeared in a fashion that now benefits Plaintiff's arguments.  It is apparent in the record that the marginal differences in font size and location do not impact the court's analysis.  Even assuming that the cover page was not presented to Plaintiff, that assumed fact would also not affect the court's analysis. The portions of the contract upon which Plaintiff focuses his argument remain the same in both versions.

Plaintiff contends that comparison of the administration page with the customer pages reveals a subtle design meant to defraud customers. (Pl.'s Br. at 19-20).

Based upon the court's examination of the exemplar provided, the "administration" page is printed on stiffer, somewhat heavier stock paper. The other pages, meanwhile, are thinner, fairly ordinary stock paper.[4] The front of the administration page is divided into four Sections meant to be filled out with the details of the parties and the service agreement. Sections 1-4 ask for customer information, services to be provided, equipment to be installed, and billing information. At the bottom is a signature line for the customer to sign. The text on the front of the first customer page is identical to the text on the front of the administration page. However, the important difference, according to Plaintiff, is between the back sides of the two pages.

The reverse of the administration page contains Sections 5-10, which ask for supplemental customer information, emergency contacts, a password, notes for the installer, profile codes, and a place to list customer referrals for new buisness. The reverse of the first "customer" page, on the other hand, lists the first fourteen of twenty-eight Paragraphs, not Sections. These fourteen Paragraphs, like the second fourteen Paragraphs on the second customer page, contain the "Terms and Conditions" of the contract. The paragraphs concerning limitation of liability are specifically referenced in

---

[4] Plaintiff describes two of these pages as "onion skin paper pages." (Pl.'s Br. at 20.) The court disagrees with Plaintiff's characterization. Unlike onion skin pages, the pages in question are not transparent or translucent or sufficiently gossamer to qualify as onion skin. While they are not printed on paper as thick as the administration page, they are nonetheless printed on ordinary stock paper.

a notice printed somewhat above Plaintiff's signature. According to the notice, printed in all capital letters:

> YOU ADMIT THAT YOU HAVE READ THE FRONT AND BACK OF THIS PAGE IN ADDITION TO THE ATTACHED PAGE WHICH CONTAINS IMPORTANT TERMS AND CONDITIONS FOR THIS CONTRACT BEFORE SIGNING. YOU STATE THAT YOU UNDERSTAND ALL THE TERMS AND CONDITIONS OF THIS CONTRACT, INCLUDING, BUT NOT LIMITED TO, PARAGRAPHS 5, 6, 7, 8, 9, AND 10. YOU ARE AWARE OF THE FOLLOWING: NO ALARM SYSTEM CAN GUARANTEE PREVENTION OF LOSS; HUMAN ERROR IS ALWAYS POSSIBLE; ALARM SIGNALS MAY NOT BE RECEIVED IF THE TELEPHONE LINE OR OTHER ALARM TRANSMISSION SYSTEM IS CUT, INTERFERED WITH, OR OTHERWISE DAMAGED.

Just below this notice is text stating, in all capitals, "A SECOND PAGE ACCOMPANIES THIS PAGE WITH ADDITIONAL TERMS AND CONDITIONS."

Several, but not all of the Paragraphs are printed in all capital letters, including the Paragraphs 5 through 10 referenced in the Notice. In relevant part, those paragraphs state the following:

> 5. . . . WE ARE NOT AN INSURER AND YOU WILL OBTAIN FROM AN INSURER ANY INSURANCE YOU DESIRE. THE AMOUNT YOU PAY IS BASED UPON THE SERVICES WE PERFORM AND THE LIMITED LIABILITY WE ASSUME UNDER THIS CONTRACT AND IS UNRELATED TO THE VALUE OF YOUR PROPERTY OR THE PROPERTY OF OTHERS LOCATED IN YOUR PREMISES. IN THE EVENT OF ANY LOSS OR INJURY TO ANY PERSON OR PROPERTY, YOU AGREE TO LOOK EXCLUSIVELY TO YOUR INSURER TO RECOVER DAMAGES. YOU WAIVE ALL SUBROGATION AND OTHER RIGHTS OF RECOVERY AGAINST US THAT ANY INSURER OR OTHER PERSON MAY HAVE AS A RESULT OF PAYING ANY CLAIM FOR LOSS OR INJURY TO ANY OTHER PERSON.
>
> 6. NO LIABILITY; LIMITED LIABILITY. IT WILL BE EXTREMELY DIFFICULT TO DETERMINE THE ACTUAL DAMAGES THAT MAY RESULT FROM OUR FAILURE TO PERFORM OUR DUTIES UNDER THIS CONTRACT. YOU AGREE THAT WE AND OUR AGENTS, EMPLOYEES, SUBSIDIARIES, AFFILIATES AND PARENT COMPANIES ARE EXEMPT FROM LIABILITY FOR ANY LOSS, DAMAGE, INJURY OR

> OTHER CONSEQUENCE ARISING DIRECTLY OR INDIRECTLY FROM THE SERVICES (INCLUDING INTERNET/WEBSITE SERVICES) WE PERFORM OR THE SYSTEMS WE PROVIDE UNDER THIS CONTRACT. IF IT IS DETERMINED THAT WE OR ANY OF OUR AGENTS, EMPLOYEES, SUBSIDIARIES, AFFILIATES OR PARENT COMPANIES ARE DIRECTLY OR INDIRECTLY RESPONSIBLE FOR ANY SUCH LOSS, DAMAGE, INJURY OR OTHER CONSEQUENCE, YOU AGREE THAT DAMAGES SHALL BE LIMITED TO THE GREATER OF $500 OR 10% OF THE ANNUAL SERVICE CHARGE YOU PAY UNDER THIS CONTRACT. THESE AGREED UPON DAMAGES ARE NOT A PENALTY. THEY ARE YOUR SOLE REMEDY NO MATTER HOW THE LOSS, DAMAGE, INJURY OR OTHER CONSEQUENCE IS CAUSED, EVEN IF CAUSED BY OUR NEGLIGENCE, GROSS NEGLIGENCE, FAILURE TO PERFORM DUTIES UNDER THIS CONTRACT, STRICT LIABILITY, FAILURE TO COMPLY WITH ANY APPLICABLE LAW, OR OTHER FAULT . . . .
>
> 7. EXCLUSIVE DAMAGES REMEDY. YOUR EXCLUSIVE DAMAGE AND LIABILITY REMEDIES ARE SET FORTH IN PARAGRAPH 6 ABOVE. WE ARE NOT LIABLE TO YOU OR ANY OTHER PERSON FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES.

In the current form, two of the pages called for an original signature: the "administration" page and the first "central storage" page, which is also the first ordinary stock page after the administration page.[5] It seems that carbon copies of the signature and certain other information on the latter would appear on the other ordinary stock pages below, including the "customer" pages. Plaintiff contends that the contract was

---

[5] Plaintiff's representation that [t]he agreement is signed on the top page *only*," (Pl.'s Br. at 20)(emphasis added), is not supported by citation to the record. It is true that the copy provided by Defendant in its motion is signed, but there is no showing of additional pages *not* signed. Defendant's counsel at oral argument indicated that the excerpt of the deposition of Defendant's salesman that is attached to Defendant's reply brief indicated that two signatures were required. The court has reviewed that exhibit and did not find deposition testimony supporting Defendant's counsel's assertion. In light of the marginal differences between the two form contracts, and from the appearance of the minimally altered "new" contract form, which clearly requires two signatures, the court might infer that the contract form Plaintiff signed also required a second original signature on one of the pages following the administration page. This detail, however, is not material to the court's analysis.

presented to him in such a way that the above contract language was "never displayed to me, never brought to my attention." (Pl.'s Dep at 100, Def.'s Ex. A.)  He surmises that the contract may have been fastened to a clipboard and folded over in such a way that he was not aware of the terms and conditions.  (*Id.* at 101-102.)[6]  He claims that he would not have signed the contract if he was aware of the terms and conditions.  (*Id.* at 103.)  Plaintiff, a businessman, admitted in his deposition that he signs contracts, generally tries to read them, and that it is a good business practice read the contracts that he signs.  (*Id.* at 102-103.)  He further avers that he was not forced to sign anything and that the customer copy of the contract was detached and given to him.  (*Id.* at 105.)

The fact that the back sides of the administration and first customer pages did not share the same text does not compel the conclusion that the document was designed to mislead Plaintiff into believing that they did.  The notice near the signature area references Paragraphs, not Sections.  Simple review of the document would have revealed that the material being referenced was the paragraphed "Terms and Conditions" of the agreement, and not the "Sections" that solicited information from the buyer.  Plaintiff's professed confusion is the result of his failure to read and inspect the contract and not due to any inherent fraud in the design of the document.  Courts in Michigan have long held that they will not redraft a contract because a party failed to read it.  *See e.g.  Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471 (Mich. Ct. App. 2005); *Montgomery v. Fidelity & Guar. Life Ins. Co.*, 713 N.W.2d 801, 804 (Mich. Ct.

---

[6] Plaintiff's surmise, even if correct, does not release him from the common sense obligation to understand what he signs. Here, he had seventy-two hours to do so before the notice of cancellation provision, which is described below, would have expired.

App. 2005) (holding that "[a] contracting party has a duty to examine a contract and know what the party has signed, and the other contracting party cannot be made to suffer for neglect of that duty") (citing *Komraus Plumbing & Heating, Inc. v. Cadillac Sands Motel, Inc.*, 195 N.W.2d 865 (Mich. 1972), applying *Liska v. Lodge*, 71 N.W. 171 (Mich. 1897)).

    Furthermore, even if Plaintiff were somehow prevented at the signing from reading and understanding the terms and conditions of the contract, he had an additional three days under the contract's cancellation provision. Just above the place for signature appears the following notice in bold print:

> NOTICE OF CANCELLATION
>
> YOU, THE CUSTOMER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO THE END OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION.  SEE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.

Plaintiff admits that he did discuss the notice of cancellation with Defendant's sale agent. (Pl.'s Dep. at 101.) That admission, coupled with the fact that Plaintiff acknowledged receipt of the customer copy of the contract (*id.,* at 105), which undisputedly included the liability limitation provisions, deflates utterly Plaintiff's claim that he was the victim of fraud. Accordingly, the terms of the contract apply to Plaintiff's case. Because Plaintiff must be charged with fairly and knowingly signing a contract that included a release on potential liability, his reliance on cases involving fraud and overreaching is misplaced.

    Plaintiff's attempt at distinguishing the long line of cases Defendant cites in support of liability limitation for alarm service providers is not persuasive. He argues

14

that those cases involved loss of property and not "cases where the same principle holds true in a medical call button case where actual human life is so closely dependant upon [the alarm providers'] actions." (Pl.'s Br. At 21.)  The court disagrees.  The risk associated with fire, burglary, and the like is not limited exclusively to the loss or destruction of property.  Fire and home invasions also constitute threats to persons.  The threat can be as serious as death and the causes are numerous: smoke inhalation, contact with flames or heat, structural collapse, and violence at the hands of an intruder.  The cases supporting Defendant's position are indeed "legion," (Def.'s Br. at 29), and the court will not repeat the many citations Defendant presents in support of that proposition, (*id.*, at 29-30).  In particular, the court relies on the following succinct analysis of the Michigan Court of Appeals:

> Reasonableness is the primary consideration.  The contract clause limiting defendant's liability to the aggregate of six monthly payments or $250 is manifestly reasonable under the circumstances of this case.  Defendant is not in the insurance business.  Rather it provides an alarm service for a specific sum.  That sum is not a premium for theft insurance.  The contract in question made this clear.  Under these circumstances a clause limiting defendant's liability in the event the alarm system did not work properly is not unconscionable.

*St. Paul Fire & Marine Ins. Co. v. Guardian Alarm* Co.*,* 320 N.W.2d 244, 247 (Mich. Ct. App. 1982).

Because the liability limiting provisions of the contract apply to this case and effectively deny whatever damages Plaintiff could claim, the court will grant Defendant's motion for summary judgment.  Because $500 exceeds 10% of Plaintiff's annual service charge, (Contract, Def.'s Ex. B), Defendant's liability is, pursuant to paragraph 6 of the

contract, limited to $500.[7]  Defendant argued for lack causation in the alternative in the context of a defense to a possible tort action.  (Def.'s Mot. at 22-27).  With respect to contract damages, Defendant has a different position.

## V.  CONTRACT DAMAGES

At argument, Defendant acknowledged the fact of a breach of the contract. The court has determined that a breach of contract action is reasonably inferred, through notice pleading, from the complaint. Defendant also confirmed that in the event that the court were to find, as it has, that no tort liability or related damages could be sought in this case, nothing should stand in the way of a summary judgment in favor of Plaintiff, but limited to the amount contracted for, $500.00.[8]

## VI.  CONCLUSION

For the reasons discussed above, IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. #19] is GRANTED IN PART as to Plaintiff's prayer for relief in tort.

IT IS FURTHER ORDERED that, pursuant to the parties' contract, Defendant's liability is limited to $500.

IT IS FURTHER ORDERED that Defendant's "Motion *In Limine*" [Dkt. #20] is DENIED as moot.

IT IS FURTHER ORDERED that Summary Judgment shall issue in favor of

---

[7]Plaintiff's installation and annual service charges under the agreement were, respectively, $679 and $395.88.  (Contract at 1, Def.'s Ex. B.)

[8] The court fully appreciates, nonetheless, that this outcome represents a bitter "success" for Plaintiff.

Plaintiff for Breach of Contract, and that damages are hereby awarded in the amount of

$500.00

                           S/Robert H. Cleland
                           ROBERT H. CLELAND
                           UNITED STATES DISTRICT JUDGE

Dated: October 20, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, October 20, 2006, by electronic and/or ordinary mail.

                           S/Lisa Wagner
                           Case Manager and Deputy Clerk
                           (313) 234-5522